Gary M. Gaertner, Jr., Judge
Introduction
C.N.N. (Mother) appeals the trial court's judgment terminating her parental rights to her two minor children, J.L.D. and I.N.D. While almost all termination of parental rights (TPR) cases are sad, here we face a situation in which either outcome is unfortunate for Mother, the children, or both. This is because the trial court terminated Mother's parental rights at a point in time when Mother had not been permitted to see her children for nearly two years, and the children's bond to their mother had understandably waned, leaving them strongly desiring to stay with their foster parents. At the same time, while Mother made substantial progress toward the objectives of her service plan, she was a poor woman, dealing with domestic violence, who had trouble securing her own stable housing and employment. Given the lack of the children's bond to their Mother, reinstating visits and potentially returning them to her custody in the future is difficult. However, given Mother's progress toward changing her circumstances and improving herself, it is also difficult to see what more Mother should or could have done besides simply doing it more quickly, and termination of parental rights is never something this Court or any Missouri court takes lightly.
The statute governing termination of parental rights, Section 211.447,[1] requires consideration of both the parent's progress toward eliminating a harmful situation and the child's best interests. However, the statute first requires the trial court to find a ground for termination, which focuses on the conduct of the parent, before the statute requires the trial court to consider the best interests of the child. Section 211.447.7; In re N.R.W., 112 S.W.3d 465, 468 (Mo. App. W.D. 2003) (TPR is "two-step analysis ... if (and only if) grounds for termination exist, the trial court must determine whether [TPR] is in the child's best interest").
While certainly the impact on the children of any decision regarding their custody is of utmost importance, and in fact the grounds for a TPR require foremost consideration of the children's safety, Missouri's legislature and its courts have made clear that the parent-child relationship deserves fundamental protection, and we should seldom, if ever, terminate that parent-child relationship, especially where a parent has made progress, albeit imperfect, toward improving that relationship and creating a safer environment for their children. In re S.M.H., 160 S.W.3d 355, 368-69 (Mo. banc 2005) ("The issue is *909 whether progress has been made in complying with the service agreements, not whether there has been full or substantial compliance"). The primary issue is not whether the children would have more care and opportunity in another home (if this was the standard, many children who are not abused would be justifiably removed from their homes), but whether the parent-child relationship is potentially harmful in the ways that led the trial court to take jurisdiction over the children. See In re B.S.B., 76 S.W.3d 318, 335-36 (Mo. App. W.D. 2002) ("The issue is not whether the children would be better off in another home. Although the primary concern is always the best interests of the children, before the court can reach the issue of children's best interests, there must be sufficient proof of acts authorizing termination under the statutes" (citation and quotation omitted) ); see also In re K.A.W., 133 S.W.3d 1, 9-10 (Mo. banc 2004) (past behavior must be linked to likelihood of future harm).
Considering this structure of the law in Missouri, along with the full record here, though we acknowledge the long road ahead and the hardship non-termination could place on these two children in the future should Mother and the children not receive therapeutic support to repair the parent-child relationship, we cannot say that substantial evidence supported the trial court's finding of clear, cogent, and convincing evidence of a ground for termination that instantly tilted the scales in favor of termination. See K.A.W., 133 S.W.3d at 12. We reverse and remand.
Background
In February of 2016, the Juvenile Officer of St. Louis County filed a petition to terminate the parental rights of Mother[2] to J.L.D. (J.D.), who was ten years old at the time of filing, and I.L.D. (I.D.), who was nine years old (collectively, "the children"). On July 21, 2014, the trial court adjudicated the children abused and neglected, and since then, the children have been under the jurisdiction of the court. That adjudication arose from an incident in which the children's older siblings had gotten into a physically violent altercation with the children's father, M.D. (Father).
Since that time, the children have been together in the same foster care placement. Mother entered a written service agreement with Children's Division, which initially had the goal of reunification. The plan provided supervised visits twice per month, and Mother agreed to make voluntary financial contributions toward the children's support, participate in a parenting assessment, attend counseling as directed by Children's Division, and maintain adequate housing.
Mother participated in a psychological evaluation and parenting assessment with Dr. Lisa Emmenegger in October and November of 2014, Dr. Emmenegger diagnosed Appellant with an unspecified personality disorder, relationship stress with an intimate partner, a parent-child relationship problem, partner violence, and ruled out perpetrator partner violence. Dr. Emmenegger recommended Mother see a different therapist than Father, and that Mother participate in domestic violence and parenting classes. Mother participated in individual therapy with Dr. Renee Smola until April of 2015, when Dr. Smola discharged Mother after completing domestic violence education and prevention. In the spring of 2016, Mother also obtained *910 a certificate of completion for a Family Strength class from ROW, a program that educates women on budgeting and parenting. Mother also completed a financial education class through REAP, and domestic violence class through the YMCA. Mother resumed individual therapy in August of 2016, but Dr. Smola terminated therapy in October of 2016 because of missed appointments.
In the meantime, the children received trauma therapy from Dr. Amy Escott from January to August of 2015. During that time, they made several disclosures to Dr. Escott, and they were exhibiting several behaviors requiring treatment. I.D. expressed fear of living with her parents because she might be sexually abused or harmed, fear that her parents would kidnap her, and fear that someone in her family would kill her or her foster-parents. I.D. disclosed that she had been exposed to sexualized contact within the home, seeing her parents engaging in sexual acts, Mother showing her and J.D. videos of Mother and Father engaging in sexual acts, and Father showing her pornography. I.D. also disclosed that Father had beaten her with a belt, and there was an incident in which Father had invited her into the bathroom and then urinated on her. I.D.'s behaviors included inappropriate sexual behaviors, difficulty with peers and being disruptive, and using inappropriate language.
J.D. entered therapy with significant anger and aggression issues, and at times had had behavioral outbursts. J.D. also exhibited behaviors of lying and hoarding food. J.D. disclosed to Dr. Escott that she had seen violence between her parents and between her older siblings and their parents. J.D. also disclosed being in bed with her parents while they were engaging in sexual activity. J.D. stated she had seen Father use the belt to hurt I.D., and that she had seen inappropriate sexual interactions between Mother and Father and between Father and another partner, J.D. expressed fear and worry for her safety and for the safety of her foster parents.
Mother participated in supervised visits with the children from July 9, 2014 through April 3, 2015. On April 15, 2015, Mother's visits were suspended because she and one of the children's older siblings followed the children on their way to a visit with their grandmother, and because Mother had violated a court order by having visitation with the older sibling, who was also under the court's jurisdiction. Visits resumed in May of 2015, but Children's Division again suspended visits on May 21, 2015, because the children said Mother had showed them something on her phone that indicated the children were going to be adopted. The trial court addressed visitation at a subsequent hearing and denied further visits with Mother.
In May of 2016, the trial court reinstated visitation at the discretion of Children's Division. Though the children's therapy had ended in 2015 and their behaviors had improved, Children's Division requested a consultation with Dr. Escott in August of 2016 because when the children's case manager brought up the possibility of resuming visits, the children's negative behaviors returned. At the time of the trial in this matter in February and March of 2017, the children had not seen their parents since May of 2015, and the children's therapist testified they were not bonded to either parent. The children's foster mother submitted letters from the children expressing their wishes to be adopted by their foster parents.
In addition to the parenting assessment and counseling, Mother's service plan called for her to maintain employment and appropriate housing. Mother's employment records show several different jobs with *911 varying wages. Additionally, her housing was unstable until October of 2016, when she rented an apartment. She lives there alone,[3] and the Children's Division case manager testified that it was appropriate housing. Mother testified she has stable employment, and the case manager had not confirmed this at the time of trial. In terms of support, Children's Division records show that Mother paid $311 for J.D. and possibly $281 for I.D. in February of 2015. There was an additional pay stub showing Mother paid $729.87 in child support in 2016. She also brought gifts to the children during visits, including candy, toys, bibles, nail polish, and some clothing. Since visits were suspended, Mother had not provided any child support or written communication with the children.
The trial court entered an order terminating Mother's parental rights on two grounds. First, the trial court found that the children were adjudicated abused or neglected on July 21, 2014, and therefore made findings under Section 211.447.5(2). The trial court additionally found that grounds for termination existed under Section 211.447.5(3) because the children had been under the jurisdiction of the juvenile court for a period of one year, that harmful conditions continue to exist, and that Mother's efforts have been insufficient to bring about lasting change and allow return of the children. Finally, after considering the factors in Section 211.447.7, the trial court found that termination of parental rights was in the best interests of the children. This appeal follows.
Standard of Review
In termination of parental rights cases, we defer to the trial court's ability to judge the credibility of witnesses and will affirm the judgment unless there is no substantial evidence to support it, it is contrary to the evidence, or it erroneously declares or applies the law. K.A.W., 133 S.W.3d at 11. We review conflicting evidence in the light most favorable to the judgment. Id. at 12. We focus on whether the grounds for termination are supported by "clear, cogent and convincing evidence," which is evidence that "instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." Id.
We also bear in mind the constitutional implications of a termination of the parent-child relationship, which is a fundamental liberty interest. Id."Those faced with forced dissolution of their parental rights have a more critical need for protections than do those resisting state intervention into ongoing family affairs. The termination of parental rights has been characterized as tantamount to a 'civil death penalty.' " Id. (citations omitted).
Thus, we "must examine the trial court's findings of fact and conclusions of law closely." Id. We construe the applicable statutes "strictly ... in favor of the parent and preservation of the natural parent-child relationship." Id.
Discussion
Mother raises three points on appeal. In points I and II, respectively, Mother argues the trial court's judgment lacks evidentiary support to find grounds for termination of parental rights under Section 211.447.5(2) and (3) by clear, cogent, and convincing evidence. Because we agree, we need not address the trial court's analysis *912 regarding best interests of the children, which Mother raises in point III. In re W.C., 288 S.W.3d 787, 802 (Mo. App. E.D. 2009).
Point I
In Point I, Mother argues that the trial court's judgment finding grounds for termination under Section 211.447.5(2) by clear, cogent, and convincing evidence was not supported by substantial evidence. We agree.
Section 211.447.5 lists the grounds for termination that may prompt the filing of a petition for termination of parental rights. Subsection (2) states, "The child has been abused or neglected." The children were adjudicated abused or neglected in 2014, and Mother does not dispute that adjudication. In a case of abuse or neglect, Subsection (2) requires the trial court to consider and make findings regarding four factors:
(a) A mental condition ... such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;
(b) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control of the child ...;
(c) A severe act or recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family by the parent, including an act of incest, or by another under circumstances that indicate that the parent knew or should have known that such acts were being committed toward the child or any child in the family; or
(d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development.
Section 211.447.5(2). These factors are not themselves separate grounds for termination, but "proof of one such factor is sufficient to support termination on the statutory abuse or neglect ground." In re K.M.C., III, 223 S.W.3d 916, 923 (Mo. App. S.D. 2007). Subsection (b) is not at issue here, as the trial court found Mother did not have a chemical dependency.
Regarding subsection (a), the trial court found that Mother does not suffer from a mental condition that cannot be improved, but that she "failed to engage in timely, appropriate mental health services and to alter her behavior." However, analysis under subsection (a) includes analysis only of the mental condition's documentation, duration, and severity. In re L.J.D., 352 S.W.3d 658, 664 (Mo. App. E.D. 2011) (citing K.A.W., 133 S.W.3d at 14 ). The trial court's finding that Mother does not suffer from the requisite type of mental condition here is the relevant finding under the plain language of this subsection, and any findings regarding her lack of timely effort are discussed below in analysis of the ground for termination in Section 211.447.5(3), failure to rectify.
Regarding severe or recurrent acts of abuse, subsection (c), the trial court found that the children experienced many traumatic events while residing with Mother including inter-partner violence, neglect, emotional abuse, homelessness, impaired caregiving, and physical abuse, and that Mother exposed the children to inappropriate sexual materials and sexual activity between the parents. Additionally, the trial court made findings that the children were *913 abused by Father while residing with both Father and Mother.
"An essential part of any determination whether to terminate parental rights is whether, considered at the time of the termination and looking to the future, the child would be harmed by a continued relationship with the parent." K.A.W., 133 S.W.3d at 9. "Past behavior can support grounds for termination, but only if it is convincingly linked to predicted future behavior. There must be some explicit consideration of whether past acts provide an indication of the likelihood of future harm." Id. at 10. (emphasis added). "[A]buse or neglect sufficient to support termination under section 211.447.[5](2)[4] [must] be based on conduct at the time of termination, not just at the time jurisdiction was initially taken." Id."Findings supporting earlier determinations are not irrelevant, but they must be updated to address the extent to which they describe the time of the termination and the potential for future harm," Id.
Though the trial court's findings regarding past abuse and neglect are supported by substantial evidence, we find that the court failed to make the necessary explicit findings regarding future harm. Further, any implied finding of future harm is contrary to the evidence. The trial court did not appear to consider the fact that Mother no longer resided with Father, though the evidence indicates that Father was the perpetrator of the majority of the abuse toward the children. Mother's choice to establish her own residence should have affected the trial court's determination of the likelihood of future harm to the children in that respect.
Additionally, though the trial court noted Mother acted inappropriately resulting in a suspension of visits even after completing therapy, the trial court did not distinguish between Mother's inappropriate actions at the time the children came under the court's jurisdiction and at the time of termination. While exposing the children to sexual content and activity before the children came under the court's jurisdiction is a serious and extremely troubling finding against Mother, her actions resulting in suspension of visits were not of this nature. After completing therapy and educational classes, it is unclear what more Mother would have to do to show she knows exposing the children to sexual content is inappropriate, and there is no evidence regarding Mother's current view of such actions on the record. Though following the children after a visit, which violated a court order, and showing the children something about adoption[5] were all clearly inappropriate, we do not see them as indicators that "instantly tilts the scales" that Mother would continue to inflict the kind of abuse that she had at the time the children came under the court's jurisdiction. The trial court's failure to explicitly connect Mother's past behavior to any future harm, coupled with the trial court's failure to consider changed circumstances, lead us to conclude the court's findings under Section 211.447.5(2)(c) are insufficient.
Finally, the trial court found under subsection (d) that Mother continuously failed to adequately provide for the children. Specifically, the trial court noted that *914 Mother provided some items during visits, but that they were "token in nature and not sufficient to sustain the child[ren]." The trial court noted Mother's child support payments, but concluded that Mother did not provide consistent financial contributions and that there was no evidence she was not able-bodied and capable of earning income. The court also found that Mother failed to maintain housing for over two years, until October of 2016 when she did obtain appropriate housing.
Again, the trial court's judgment does not contain explicit findings regarding future harm to the children through a lack of provision on Mother's part. Child support was not included in her service plan, though she agreed to voluntarily provide it. Mother's contributions, though not sufficient to support the children, do indicate her intent to continue the parent-child relationship. See S.M.H., 160 S.W.3d at 367. She discontinued giving gifts and clothing only when she was denied further visitation with the children. There was also evidence that Mother's employment changed frequently: when the children entered the court's jurisdiction, Mother worked for Father's company, and after that she worked in various restaurant positions, with the amount of pay varying among her pay stubs. At the same time, Mother's housing was also unstable, and she was in process of gaining housing separate from her domestically violent partner. Under these circumstances, there is no indication she could have afforded additional child support. However, at the time of trial, there was undisputed evidence that both Mother's employment and housing had stabilized. The trial court failed to take this into account, or to make explicit findings that Mother would still be unable or unwilling to provide in the future, resulting in harm to the children.
Thus, we find the trial court's findings under Section 211,447.5(2) were not sufficiently supported by evidence to "instantly tilt[ ] the scales in favor of termination when weighed against the evidence in opposition." K.A.W., 133 S.W.3d at 12. Point granted.
Point II
In Point II, Mother argues that the trial court's judgment that she failed to rectify the conditions leading to the court taking jurisdiction over the children, under Section 211.447.5(3), was not supported by substantial evidence. We agree.
Section 211.447.5(3) provides the following ground for termination of parental rights:
The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home.
The statute goes on to require the court to consider and make findings on the following four factors:
(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;
(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to *915 provide a proper home for the child;
(c) A mental condition [identical to the wording of Section 211.447.5(2)(a) ];
(d) Chemical dependency [identical to the wording of Section 211.447.5(2)(b).]
Section 211.447.5(3). The trial court made the following finding before considering the four factors in subsections (a)-(d):
The child[ren] ha[ve] been continuously under the jurisdiction of the Family Court, since July 21, 2014, a period of greater than one year, and: (1) the neglect/abuse conditions that lead to adjudication persist or (2) conditions of a potentially harmful nature continue to exist, or (3) the continuation of the parent/child relationships greatly diminish[ ] the child[ren]'s prospects for early integration into a stable and permanent home.
However, courts have noted that this disjunctive summary of the statute contradicts the plain language of the statute, and such a judgment constitutes plain error where not raised by an appellant.[6] In Interest of K.M.A.-B., 493 S.W.3d 457, 473-74 (Mo. App. E.D. 2016) (citing In re B.J.K., 197 S.W.3d 237, 243 (Mo. App. W.D. 2006) ; In re A.L.M., 354 S.W.3d 645, 653 (Mo. App. S.D. 2011) ). Whereas the summary suggests there are three alternative bases for termination, the statute's logical scheme contains two findings with possibilities within each. Id. at 473. "The first required finding focuses on the nature of the child's present and future conditions, whether it is the condition that led to jurisdiction or another potentially harmful condition." Id."The second required finding focuses on whether that condition 'doom[s] the child's prospects for living in an acceptable environment,' either because the condition is unlikely to be remedied ... or because continuing in the relationship with the parent under that condition will make it harder for the child to achieve a stable and permanent home somewhere." Id. (quoting B.J.K., 197 S.W.3d at 245 ).
Here, as in K.M.A.-B, the trial court's judgment lists three grounds in the disjunctive and does not indicate on which one the trial court actually relied. Id. This means it is possible Mother's rights were terminated solely on the basis of a hindrance to the children's integration into a stable and permanent home, without any finding regarding a present or future harmful condition. See id. This constitutes plain error because "termination without clear, cogent and convincing evidence of a harmful condition would be a manifest injustice or miscarriage of justice." Id. at 473-74.
"As a result of this error, the other findings on this ground are also insufficient." Id. at 474. The factors "are not separate grounds for termination by themselves, but rather categories of evidence that the court may consider along with all other relevant evidence in determining whether grounds for termination exist under Section 211.447.5(3)." Id. (quoting In Interest of S.D., 472 S.W.3d 572, 577 (Mo. App. W.D. 2015) ). Here, the trial court's findings on subsections (c), a mental condition and (d), a chemical dependency, were identical to its findings under Section 211.447.5(2), discussed in Point I. We noted regarding a mental condition, the trial court found Mother does not suffer from a mental condition that cannot be corrected which renders her unable to care for the children, but that Mother "fail[ed] to engage in timely, appropriate mental health services and to alter her behavior." The trial court fails to explicitly connect this to *916 any present or future harm to the children, and as we have already noted, there is no evidence regarding whether Mother's prior behavior of exposing the children to inappropriate sexual conduct would potentially continue as she had not been permitted to visit with the children since completing parenting and domestic violence education.
Additionally, regarding subsection (a), the extent of Mother's progress under the service plan, the trial court failed to consider the undisputed evidence of Mother's current housing arrangement and that she lives alone in suitable housing, finding "[t]he substantial family dysfunction and the pervasive family culture of violence by members of the household continue to be conditions of a potentially harmful nature." This finding is not supported by substantial evidence. Further, the trial court found the children are afraid of Mother, and that this was a condition of a potentially harmful nature. However, rather than finding that Mother would potentially harm the children, the trial court focused on the children's fear, when there was evidence that their therapist was uncertain about whether the children's fears were well-founded, especially in light of Mother's separation from Father. While the trial court noted that Mother did not fully comply with the terms of her service agreement, she did make progress, and the issue is "not whether there has been full or even substantial compliance," but progress. K.M.A.-B. 493 S.W.3d at 474. Even where there is a failure to achieve progress, such failure supports termination "only when the harmful condition underlying termination is left uncorrected as a result." Id. As we have noted, the trial court failed to make explicit findings regarding future harm in light of the progress Mother has made, especially regarding her housing and separation from Father, and even how that would affect the children's fear.
Finally, the trial court considered the agency's efforts in subsection (d), and found the agency's efforts were hampered by Mother's changing living arrangements and her failure to keep the agency aware of her current address and contact information. Conversely, the agency, though it had discretion to reinstate Mother's visits in 2016, and there was some evidence in the record that despite the children's desire not to have visits, they were potentially open to visits if they took place with the case manager present, Children's Division chose not to reinstate visits. Almost a year had passed from Mother's inappropriate conduct that had resulted in discontinuing visits before, and Mother was never given an opportunity to correct her behavior with the children. The case manager testified that she could not comment on any change in Mother's parenting skills because she had not observed Mother parenting at visits recently. Mother continued to request visits, and Children's Division withheld them. The children's bond to their Mother, which undisputedly was present when they came under the court's jurisdiction, diminished during the two years they did not see her. The trial court's judgment finding the agency's efforts were appropriate fails to consider this evidence and the Division's contribution to the lack of bond between Mother and the children.
Because the findings are insufficient, the judgment regarding Mother's failure to rectify under Section 211.447.5(3) must be reversed. Point granted.
Point III
Mother disputes the trial court's findings under Section 211.447.7, the best interests of the children. However, this analysis is not required unless a ground for termination under Section 211.447.2, 4, or *917 subdivisions (1) through (4) of subsection 5 is found by clear, cogent, and convincing evidence and supported by substantial evidence. Section 211.447.7. Because we have found no such grounds existed, we must reverse, and we need not analyze the trial court's findings under Section 211.447.7. See W.C., 288 S.W.3d at 802.
Conclusion
We find generally that the trial court failed to make explicit findings regarding present or future harm to the children and failed to consider Mother's changed circumstances as it relates to housing, her relationship with Father, and her completion of various programs on parenting and domestic violence. Though the trial court noted Mother made some of these changes late in the process, and therefore harmful conditions perhaps persisted longer than necessary, that does not mean such conditions continued to exist at the time of termination. While we note the lack of bond between Mother and the children and the difficulty this contributes to repairing the parent-child relationship, we also note the Division's role in this circumstance, and that even the lack of current bond, while unfortunate and difficult to correct, does not necessitate a finding of a harmful condition for the children. The importance of the interest at stake here and the evidence on this record does not convince us that the scales were "instantly tilted" in favor of termination. We reverse the judgment of the trial court terminating Mother's parental rights, and we remand for further hearing on the present circumstances to determine why reunification is not the most appropriate permanency plan for the children.[7] The trial court is to retain jurisdiction over the children to make a determination when and if reunification will be appropriate in the future.
Kurt S. Odenwald, P.J., concurs.
Colleen Dolan, J., concurs.

All statutory references are to RSMo. (Supp. 2016), unless otherwise indicated.

The petition also sought to terminate the parental rights of the children's father (Father), which the trial court granted, but only Mother appealed. We do not review the termination of Father's parental rights.

Though Father was present for part of the trial in this matter, the record reflects he had stopped making contact with Children's Division either late in 2015 or early in 2016, and he had moved to Nevada.

The K.A.W. court cited the same ground for termination we consider here-abuse and neglect, but the statutory subsection number has since been amended. The alteration in this quote reflects the current version of the statute.

Mother's testimony was that the children asked to use her phone and saw something about adoption on it, but others testified that Mother showed the children.

Mother did not raise this issue on appeal.

The findings must be updated to address present circumstances. See In re K.A.W., 133 S.W.3d 1, 10 (Mo. banc 2004) ("Findings supporting earlier determinations are not irrelevant, but they must be updated to address the extent to which they describe the time of the termination and the potential for future harm.").